FILED
NOVEMBER 7, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

07 C 6304

NISSAN NORTH AMERICA, INC.,

Plaintiff,

vs.

JIM M'LADY OLDSMOBILE, INC.

Defendant.

No.

JUDGE MANNING
MAGISTRATE JUDGE DENLOW

J. N.

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, NISSAN NORTH AMERICA, INC., seeks declaratory relief from this Honorable Court pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. 28 U.S.C.§2201 alleging as follows:

## I. JURISDICTIONAL STATEMENT

1. At all relevant times hereto, Plaintiff Nissan North America, Inc. (hereinafter "NNA") was and now is a California corporation with a principal place of business in either Gardena, California or Nashville, Tennessee.

2. At all relevant times hereto, Defendant Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan (hereinafter "M'Lady") was and now is a Delaware corporation with a principal place of business in Crystal Lake, Illinois.

3. Pursuant to 28 U.S.C. §1332(a)(1), NNA and M'Lady are citizens of different States.

4. The matter in controversy between NNA and M'Lady exceeds the sum of value of $75,000 as provided in 28 U.S.C. §1332(a).

5. This Honorable Court possesses original jurisdiction pursuant to 28 U.S.C. §1332 *et. seq.*

6. Venue of this case is proper before this Honorable Court pursuant to 28 U.S.C. §1391(a).

7. This present dispute involves issues of statutory construction and principles of contract law involving the Illinois Motor Vehicle Franchise Act and the laws of Illinois and California. Illinois courts are presumed to possess original jurisdiction over all justiciable matters. *People v. N L Industries,* 152 Ill.2d 82 (1992); *Employers Mutual Companies v. Skilling,* 163 Ill.2d 284 (1994). Illinois courts only lose their jurisdictional power where a legislative act specifically and unequivocally vests sole and exclusive jurisdiction in an administrative agency. *People v. N L Industries,* 152 Ill.2d 82 (1992); *Employers Mutual Companies v. Skilling,* 163 Ill.2d 284 (1994). The Illinois Motor Vehicle Franchise Act ("Franchise Act") does not vest sole and exclusive jurisdiction with the Illinois Motor Vehicle Review Board. *See, e.g.,* 810 ILCS 710/13. When a statute, such as the Franchise Act, does not vest sole and exclusive jurisdiction with an administrative agency, Illinois courts possesses concurrent jurisdiction. *People v. N L Industries,* 152 Ill.2d 82 (1992); *Employers Mutual Companies v. Skilling,* 163 Ill.2d 284 (1994). This Honorable Court, pursuant to *Erie v. Tompkins,* 304 U.S. 64 (1938), sits with the powers of an Illinois Circuit Court and need not defer the initial jurisdiction of this dispute to the Illinois Motor Vehicle Review Board.

8. The present dispute involves the issue of subject matter jurisdiction and, thus, presents an issue of law for determination by this Honorable Court. Questions of law are the particular province of the courts. *Employers Mutual Companies v. Skilling,* 163 Ill.2d 284 (1994). The Illinois Motor Vehicle Review Board neither possesses specialized knowledge or

technical expertise to determine the issue of subject matter jurisdiction. *Employers Mutual Companies v. Skilling,* 163 Ill.2d 284 (1994). The declaratory relief sought in this Complaint must be decided by this Honorable Court.

9. NNA and M'Lady have been involved in a protracted dispute concerning the existence, if any, of an unspecified relationship between the parties. *See Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan*, 307 F.3d 601 (7th Cir. 2002); *Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan*, 486 F.3d 989 (7th Cir. 2007). A declaration of certain rights of the parties would either conclude or materially advance the resolution of this dispute.

10. NNA and M'Lady have experienced a breakdown in the business relationship that is irreconcilable and the relationship should be terminated.

11. Pursuant to 28 U.S.C.§2201(a), this Honorable Court has jurisdiction to enter declaratory relief due to the presence of an actual controversy between NNA and M'Lady.

## II. FACTUAL BACKGROUND

12. On May 21, 1992, NNA and M'Lady entered into a written Nissan Sales and Service Agreement ("original" agreement) establishing M'Lady as a Nissan automobile dealership. A copy of the original Nissan Sales and Service Agreement is attached hereto as Exhibit A. Paragraph 12 of the original Sales and Service Agreement outlined various deadlines M'Lady was required to meet for the development and construction of an exclusive Nissan showroom. Paragraph 12 of the original Sales and Service Agreement provided that M'Lady complete construction of the exclusive Nissan showroom on or before April 1, 1995.

13. Paragraph 12 of the original Sales and Service Agreement also provided that: "New dealership must be fully operational on or before the expiration of the term of this Agreement. Failure to do so shall constitute a material breach of the Agreement."

14. The original Sales and Service Agreement included a merger clause requiring all revisions and amendments to be in writing. Exhibit A.

15. The original Sales and Service Agreement contained an April 1, 1995 termination date. Exhibit A.

16. On May 12, 1994, approximately eleven (11) months prior to the expiration of the original Sales and Service Agreement, NNA and M'Lady executed Amendment No. 1 which extended the expiration date of the original Agreement to November 1, 1996. A copy of Amendment No. 1 to the original Nissan Sales and Service Agreement is attached hereto as Exhibit B.

17. Amendment No. 1 extended the timeframe for M'Lady to complete construction of the exclusive Nissan showroom to November 1, 1996. Exhibit B.

18. On September 27, 1994, NNA and M'Lady executed Amendment No. 2 to the original Sales and Service Agreement. A copy of Amendment No. 2 to the original Nissan Sales and Service Agreement is attached hereto as Exhibit C.

19. Amendment No. 2 extended the timeframe for M'Lady to complete construction of service facilities to March 31, 1995. The timeframe for M'Lady to complete the exclusive Nissan showroom remained unchanged from the date set forth in Amendment No. 1 (*i.e.*, November 1, 1996). Exhibits B and C.

20. On April 27, 1995, NNA and M'Lady executed Amendment No. 3 to the Sales and Service Agreement. A copy of Amendment No. 3 to the original Nissan Sales and Service Agreement is attached hereto as Exhibit D.

21. Amendment No. 3 did not substantively change the terms of the existing written Sales and Service Agreement but simply amended identification of M'Lady's name and address on the face of the written Sales and Service Agreement. Exhibit D.

22. On May 18, 1998, NNA and M'Lady executed Amendment No. 4 to the Nissan Sales and Service Agreement. A copy of Amendment No. 4 to the original Nissan Sales and Service Agreement is attached hereto as Exhibit E.

23. Amendment No. 4 incorporated the prior terms of the Sales and Service Agreement and included a termination date of May 1, 1999. Exhibit E.

24. Amendment No. 4 provided that M'Lady was required to complete construction of the exclusive Nissan showroom by May 1, 1999. Exhibit E.

25. At no time prior to May 1, 1999 did M'Lady complete construction of the exclusive Nissan showroom as provided in the original Sales and Service Agreement, Amendment No. 1, Amendment No. 2 and Amendment No. 4.

26. On April 14, 1999, as a consequence of M'Lady's failure to meet the original deadline to complete construction of an exclusive Nissan showroom contained in the initial dealer agreement as well as M'Lady's failure to comply during the duration of any of the three extensions of time (Amendments 1, 2 and 4), NNA notified M'Lady that it intended to terminate M'Lady as a Nissan dealer. A copy of NNA's April 14, 1999 correspondence is attached as Exhibit F.

27. In June 25, 1999 correspondence, NNA offered M'Lady an additional 180 days (expiring on December 14, 1999) to either begin construction of an exclusive Nissan showroom or to provide an exclusive Nissan showroom at the M'Lady facility. A copy of NNA's June 25, 1999 correspondence to M'Lady is attached hereto and incorporated by reference herein as Exhibit G.

28. At no time thereafter did M'Lady (1) respond to NNA's June 25, 1999 correspondence; (2) began construction of an exclusive Nissan showroom; or (3) provide NNA with an exclusive Nissan showroom at the M'Lady facility.

**A. M'LADY'S NOTICE OF PROTEST #1**

29. On October 20, 2000, M'Lady filed a Notice of Protest to NNA's Notice of Termination with the Illinois Motor Vehicle Review Board. (Protest # 1).

30. On November 17, 2000, NNA submitted the dispute to JAMS/ENDISPUTE pursuant to the only contract that existed between the Parties, claiming that NNA and M'Lady had agreed to an arbitration provision. Shortly after submitting the dispute to arbitration, NNA moved to stay the proceedings with the Illinois Motor Vehicle Review Board so that arbitration could proceed. After the Illinois Motor Vehicle Review Board denied NNA's motion to stay, NNA filed an action in the Federal District Court to compel arbitration.

31. Between October 20, 2000 and May 11, 2007, NNA and M'Lady were involved in protracted litigation in this Honorable Court and before the 7th Circuit Court of Appeals. During those 6 ½ years, the parties extensively litigated the issue of the existence of any agreement (written, oral or otherwise) that may have governed the relationship between NNA and M'Lady.

32. On May 11, 2007, the United States Court of Appeals for the Seventh Circuit issued a written opinion holding that no enforceable written agreement existed between NNA and M'Lady after the expiration of Amendment No. 4 to the Nissan Sales and Service Agreement on May 1, 1999, and thus no arbitration agreement existed between the parties. *Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan*, 486 F.3d 989 (7th Cir. 2007).

33. The 7th Circuit Court of Appeals' opinion contains several important findings:

(A) M'Lady did not accept any offers to extend the term of the Nissan Sales and Service Agreement beyond May 1, 1999. *Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan*, 486 F.3d 989, 995-96 (7th Cir. 2007)

(B) The Nissan Sales and Service Agreement specified that it would automatically terminate at the end of the stipulated term without any action by any party, and that any amendments must be made in writing executed by both parties. *Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan*, 486 F.3d 989, 990-91 (7th Cir. 2007)

(C) With regard to this contractual relationship described in subparagraph B, above, the 7th Circuit Court of Appeals noted: "there is no evidence that the parties ever agreed to alter that requirement to allow oral modifications or modifications implied in fact. The uncontested evidence reveals there is no written modification extending the Dealer Agreement beyond the expiration date contained in Amendment 4."

*Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan*, 486 F.3d 989, 996-97 (7th Cir. 2007)

34. On or about August 6, 2007, NNA moved to dismiss Protest #1 before the Board on grounds, *inter alia,* that it was moot. By response dated August 16, 2007, M'Lady agreed to the dismissal of Protest #1, but sought an order granting its recovery of attorneys' fees in the Protest, to which order NNA objects.

**B. M'LADY'S NOTICE OF PROTEST #2**

35. On May 25, 2007, two weeks after the 7th Circuit issued its opinion, NNA tendered another written Sales and Service Agreement to M'Lady.

36. On July 11, 2007, M'Lady rejected the offered contract and filed another Notice of Protest with the Illinois Motor Vehicle Review Board claiming that NNA's May 25, 2007 offer of a written Sales and Service Agreement was unacceptable to M'Lady as it constituted a new form of dealer agreement and would substantially change or modify the existing obligations of M'Lady. (Protest # 2).

37. M'Lady's Protest #2 reaffirms the absence of any meeting of the minds between NNA and M'Lady regarding the formation of any agreement, whether written or oral, governing whatever relationship the two entities may have shared subsequent to May 1, 1999.

38. 92 Illinois Administrative Code Section 1001.760(2)(B) mandates that the Board shall set a hearing date within 60 days of the Board's initial order.

39. On August 1, 2007, the Illinois Motor Vehicle Review Board issued its Order Scheduling a Hearing in Protest #2. A copy of the Order Scheduling a Hearing is attached hereto as Exhibit H. The Order provided that the hearing shall take place on September 10, 2007. Exhibit H.

40. 92 Illinois Administrative Code Section 1001.760(a)(2)(C) provides as follows:

> **The hearing officer may continue the hearing date more than 90 days from the date of the Board's initial order scheduling the hearing only if the parties agree to the continuance and the hearing officer finds that due to the complexity of the issue(s) involved meaningful hearing could not be held prior thereto.**

41. In the absence of (1) an agreement by the parties and (2) a finding by the hearing officer that the case presents complex issues requiring protracted litigation, the hearing on Protest #2 was required to take place no later than Wednesday, October 31, 2007.

42. NNA never agreed to continue the hearing to a date after October 31, 2007.

43. M'Lady never filed any pleading or sought an order from the Board requesting to have the hearing date extended beyond October 31, 2007.

44. The assigned Hearing Officer never made a finding wherein he found that the issue presented in M'Lady's Notice #2 involved such complex issues which precluded the parties from engaging in a meaningful hearing on the merits on or before October 31, 2007.

45. On or about November 1, 2007, NNA sent a letter to M'Lady confirming M'Lady's rejection of the dealer agreement offered by NNA, and the absence of any outstanding offer by NNA to M'Lady. NNA also stated that it would not proceed with termination of sales of M'Lady until the above-captioned action concluded or until further notice by NNA.

**C. BREAKDOWN IN THE BUSINESS RELATIONSHIP**

46. After May 1, 1999, M'Lady stopped allowing NNA to conduct its business in the customary and routine manner.

47. After May 1, 1999, M'Lady ceased to meet with and work with NNA personnel in a professional and productive manner.

48. After May 1, 1999, M'Lady refused to and continues to refuse to meet with certain representatives of NNA.

49. After May 1, 1999, M'Lady has been and continues to be confrontational, irrational, and argumentative to the point of frustrating the business relationship.

50. M'Lady has converted a day-to-day business relationship into a relationship based upon threats and legal maneuvering.

51. M'Lady has failed to cooperate or pursue its business discussions in good faith.

52. There is no longer "... a community of interest in the marketing of motor vehicles or services." 815 ILCS 710/2(i). Thus, there is no franchise agreement between M'Lady and NNA and the present business relationship should be permitted to end.

## III. FIRST REQUEST FOR DECLARATORY RELIEF

53. NNA hereby realleges the allegations set forth in paragraphs 1 to 44 of its Complaint for Declaratory Relief as if set forth fully herein.

54. On May 1, 1999, the written Sales and Service Agreement between M'Lady and NNA expired pursuant to the terms of Amendment No. 4 to the original Sales and Service Agreement.

55. After May 1, 1999, NNA and M'Lady never reached a written agreement containing mutually acceptable terms and conditions constituting an extension of either the original Nissan Sales and Service Agreement or the various amendments to the original Nissan Sales and Service Agreement.

56. After May 1, 1999, NNA and M'Lady never reached a written agreement containing mutually acceptable terms and conditions that would have replaced the original Nissan Sales and Service Agreement and its various amendments.

57. After May 1, 1999, NNA and M'Lady never reached an oral agreement addressing mutually acceptable terms and conditions constituting an extension of either the original Nissan Sales and Service Agreement or various amendments to the original Nissan Sales and Service Agreement.

58. After May 1, 1999, NNA and M'Lady never reached an oral agreement containing mutually acceptable terms and conditions that would have replaced the original Nissan Sales and Service Agreement and its various amendments.

59. After May 1, 1999, NNA and M'Lady possessed, at most, an implied relationship based upon a course of dealing between the parties.

60. In its brief before the 7th Circuit Court of Appeals, M'Lady argued that the parties neither had a written agreement nor an oral agreement but that a "franchise" agreement could be implied through a course of dealing.

61. 815 ILCS 710/2(i) defines the term "franchise" as follows:

> **"Franchise," an *oral* or *written* arrangement for a definite or indefinite period in which a manufacturer, distributor or wholesaler grants to a motor vehicle dealer a license to use a trade name, service mark, or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services related thereto at wholesale, retail, leasing or otherwise. (Emphasis Added)**

62. The Illinois Motor Vehicle Franchise Act omits implied agreements from the scope of its definition of "franchise."

63. M'Lady filed Protest #1 on October 20, 2000.

64. As of October 20, 2000, no "franchise" existed between NNA and M'Lady as that term is defined in Section 710/2(i) of the Illinois Motor Vehicle Franchise Act. Specifically, as of October 20, 2000, no "written" or "oral" arrangement existed between NNA and M'Lady

under which M'Lady could seek to file a Notice of Protest with the Illinois Motor Vehicle Review Board.

65. In the absence of a statutorily-defined "franchise," the Illinois Motor Vehicle Review Board does not possess jurisdiction to rule on M'Lady's Protest #1.

66. Likewise, at the time M'Lady filed Protest #2 on July 11, 2007, no "franchise" existed between NNA and M'Lady as that term is defined in Section 710/2(i) of the Illinois Motor Vehicle Franchise Act. Specifically, as of July 11, 2007, no "written" or "oral" arrangement existed between NNA and M'Lady under which M'Lady could seek to file a Notice of Protest with the Illinois Motor Vehicle Review Board. In addition, no "franchise" currently exists between NNA and M'Lady.

67. In the absence of a statutorily-defined "franchise," the Illinois Motor Vehicle Review Board does not possess jurisdiction to rule on M'Lady's Protest #2.

WHEREFORE, Plaintiff, Nissan North America, Inc., prays that this Honorable Court enter an order in favor of Nissan North America, Inc. declaring that:

- As of October 20, 2000, there was neither a written nor an oral "franchise" arrangement as that term is defined in the Illinois Motor Vehicle Franchise Act;
- As of July 11, 2007, there was neither a written nor an oral "franchise" arrangement as that term is defined in the Illinois Motor Vehicle Franchise Act; and
- Presently, there is neither a written nor an oral "franchise" arrangement as that term is defined in the Illinois Motor Vehicle Franchise Act; and
- In the absence of a defined "franchise" arrangement pursuant to the Illinois Motor Vehicle Franchise Act, the Illinois Motor Vehicle Review Board does not possess jurisdictional authority to consider M'Lady's October 20, 2000 Notice of Protest or M'Lady's July 11, 2007 Notice of Protest.

## IV. SECOND REQUEST FOR DECLARATORY RELIEF
**(Relief Relating to Protest #2)**

68. NNA hereby realleges the allegations set forth in paragraphs 1 to 59 of its Complaint for Declaratory Relief as if set forth fully herein.

69. M'Lady never sought a hearing in Protest #2 within 90 days of entry of the Board's initial order.

70. NNA never agreed to continue the mandatory hearing date in Protest #2 beyond the requisite 90 days.

71. The Illinois Motor Vehicle Review Board failed to conduct a hearing on M'Lady's Protest #2 on or before October 31, 2007, ninety (90) days after the Initial Order dated August 1, 2007.

72. M'Lady took no action to seek a Hearing within the required statutory time.

73. M'Lady took no action to extend the time or seek a finding that complex issues were presented.

74. 92 Illinois Administrative Code 1001.760 mandates that, in the absence of (1) an agreement by the parties and (2) a finding by the hearing officer that the case presents complex issues requiring protracted litigation, the hearing on Protest #2 was to occur on or before Wednesday, October 31, 2007.

75. By virtue of the failure to comply with 92 Illinois Administrative Code 1001.760(a)(2)(C), the Board lacks jurisdiction to rule on M'Lady's Protest #2.

76. NNA offered a written agreement to M'Lady that NNA thought contained the terms reflecting a meeting of the minds. M'Lady rejected that agreement, thereby indicating

there never was and is no meeting of the minds. NNA has not offered another agreement and thus there is no agreement between the Parties.

77. Accordingly and as additional grounds, the Motor Vehicle Review Board lacks jurisdiction over M'Lady's Protest #2 because the issues upon which M'Lady bases its Notice of Protest are moot, *i.e.*, there is no issue currently before the Illinois Motor Vehicle Review Board for determination.

WHEREFORE, Plaintiff, Nissan North America, Inc., prays that this Honorable Court enter an order in favor of Nissan North America, Inc. declaring that:

- The Illinois Motor Vehicle Review Board lacks jurisdiction to rule on M'Lady's Notice of Protest #2;

## V. THIRD REQUEST FOR DECLARATORY RELIEF (Relief Relating to Protest #1)

78. NNA hereby realleges the allegations set forth in paragraphs 1 to 66 of its Complaint for Declaratory Relief as if set forth fully herein.

79. On June 21, 2001, the United States District Court for the Northern District of Illinois entered an order staying M'Lady's Protest #1 before the Illinois Motor Vehicle Review Board pending a final determination as to the whether NNA and M'Lady had agreed to submit disputes arising under the dealer agreement to arbitration. A copy of the June 21, 2001 order is attached hereto as Exhibit I.

80. On May 11, 2007, the 7th Circuit Court of Appeals issued its opinion in *Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan*, 486 F.3d 989 (7th Cir. 2007).

81. In its opinion, the 7th Circuit Court of Appeals affirmed the District Court's ruling that the arbitration agreement contained in Amendment No. 4 expired on May 11, 1999 and was

no longer in effect. *North America, Inc. v. Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan*, 486 F.3d 989, 997 (7th Cir. 2007).

82. Therefore, the 7th Circuit Court of Appeals' May 11, 2007 opinion lifted the June 21, 2001 stay imposed by the United States District Court and remanded the protest back to the Illinois Motor Vehicle Review Board.

83. After the 7th Circuit Court of Appeals issued its May 11, 2007 opinion in *North America, Inc. v. Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan*, 486 F.3d 989 (7th Cir. 2007), it became incumbent upon M'Lady to timely prosecute any pending issues remaining in Protest #1.

84. On or about August 6, 2007, NNA moved to dismiss Protest #1 on grounds, *inter alia,* that Protest #1 was moot. By response dated August 16, 2007 (more than ninety days later), M'Lady agreed to the dismissal of Protest #1, but sought an order granting its recovery of attorneys' fees in the Protest, to which order NNA objects.

85. At no time after August 16, 2007 has M'Lady presented the Board with any evidence of its attorney's fees.

86. At no time after August 16, 2007 has M'Lady filed a pleading with the Board requesting a hearing date for a determination of whether M'Lady was entitled to an award of fees.

87. The Board has not scheduled a hearing on the Protest, the Motions, or the Fee Petition.

88. More than 90 days has passed since the 7th Circuit Court of Appeals filed its May 11, 2007 opinion in *North America, Inc. v. Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan*, 486 F.3d 989 (7th Cir. 2007).

89. NNA has never agreed to continue a hearing on any issue pending in Protest #1 beyond 90 days. *See* 92 Illinois Administrative Code Section 1001.760(2)(C).

90. No hearing has been scheduled on the issue of whether M'Lady is entitled to attorney's fees in Protest #1.

91. By virtue of M'Lady's failure to timely pursue Protest #1 by having the Illinois Motor Vehicle Review Board conduct a hearing on the issue of whether M'Lady is entitled to attorney's fees within 90 days, the Board now lacks jurisdiction to rule on M'Lady's Protest #1.

WHEREFORE, Plaintiff, Nissan North America, Inc., prays that this Honorable Court enter an order in favor of Nissan North America, Inc. declaring that:

- The Illinois Motor Vehicle Review lacks jurisdiction to rule on M'Lady's Notice of Protest #1;

## VI. FOURTH REQUEST FOR DECLARATORY RELIEF (Alternate Relief Relating to Protest #1)

92. The Illinois Act vesting authority in the Board has strictly provided timelines for that authority and role of the Executive branch. Absent adherence to those requirements divests the courts of their traditional role and the proper balance of power among the branches of government.

93. The Illinois Board issued its Initial Order on June 9, 2000. That Order was stayed by an Order of this court on June 21, 2001. The stay was removed by operation of law on May 11, 2007 when the Appellate court issued it ruling.

94. M'Lady did not pursue its Protest #1 before the Board within sixty (60) days of the Initial Order, even allowing for the tolling of time as a result of the interim Stay.

95. After May 11, 2007, M'Lady did not pursue its Protest #1 before the Board within sixty (60) days. It did not inform the Board of the need to schedule a hearing. It did not contact the Board. It did nothing to timely pursue its Protest as required by the enabling statute.

96. The Board took no action on its own initiative nor has it taken any action on Protest #1 to this date.

97. Even assuming the full sixty day period, a Hearing was to be scheduled on Protest #1 no later than July 10, 2007. No Hearing was scheduled or heard even with ninety (90) days or by August 9, 2007. Indeed, for almost 180 days no action has been taken by M'Lady or the Board to hold a Hearing on Protest #1.

98. For these reasons, NNA sought dismissal of the matter on August 6, 2007. Even within 60 days or 90 days of that action by NNA, there has been no hearing schedule entered and no action taken by the Board on Protest #1.

99. For these reasons, NNA asserts that either:

a. M'Lady has abandoned its Protest and it should be dismissed;
b. M'Lady's Protest should be dismissed for failure to timely pursue it;
c. The Board has failed to hold a Hearing within the required statutory time and thus no longer has jurisdiction to hold a Hearing; and
d. The matter should be resolved by this Court and the Protest should be dismissed for any one of the reasons noted above or other legal justification.

## VII. FOURTH REQUEST FOR DECLARATORY RELIEF

100. NNA hereby realleges the allegations set forth in paragraphs 1 to 79 of its Complaint for Declaratory Relief as if set forth fully herein.

101. Even if this Honorable Court were to conclude that there is a statutorily-defined "franchise" between NNA and M'Lady, NNA has "good cause" for terminating M'Lady as a Nissan dealer based upon M'Lady's refusal to sign Nissan's standard Sales and Service

Agreement and its refusal to permit certain NNA personnel access to the M'Lady dealership premises.

102. Due to (1) the enormous complexities necessarily involved with operating a multi-million dollar business operation, (2) the need for clearly defined rights and obligations for Nissan; (3) the need for clearly defined rights and obligations for M'Lady; and (4) the protection of Illinois consumers doing business with Nissan and M'Lady, it is a commercially reasonable business practice for NNA to require M'Lady to sign its standard Sales and Service Agreement.

103. The absence of clearly defined rights and obligations governing the relationship between NNA and M'Lady poses practical and unacceptable problems for NNA. For example, after May 1, 1999, M'Lady has refused to allow NNA's District Operations Manager onto the M'Lady premises.

104. NNA's offer of a standard Sales and Service Agreement to M'Lady which is substantially similar to the dealer agreements tendered to its dealer body across Illinois is neither arbitrary nor random. Indeed, Section 710/9 of the Illinois Motor Vehicle Franchise Act requires that NNA offer renewal agreements on "terms then equally available to all its motor vehicle dealers" in Illinois. By refusing to sign NNA's standard agreement, M'Lady seeks to extract more favorable (and presumably unwritten) terms than other Illinois Nissan dealers.

105. M'Lady's refusal to sign the offered Sales and Service Agreement is unreasonable, as is its refusal to allow certain NNA personnel onto the M'Lady Premises.

106. NNA possesses "good cause" for termination of M'Lady as a Nissan dealer based upon his refusal.

WHEREFORE, Plaintiff, Nissan North America, Inc., prays that this Honorable Court enter an order in favor of Nissan North America, Inc. declaring that:

- NNA has "good cause" to terminate M'Lady as a Nissan dealer;
- NNA may discontinue sales of its products to M'Lady.

Respectfully submitted,

**SWANSON, MARTIN & BELL, LLP**

By: ______________________________
Bruce S. Terlep

Bruce S. Terlep
Matthew D. Jacobson
**SWANSON, MARTIN & BELL, LLP**
2525 Cabot Drive, Suite 204
Lisle, Illinois 60532
(630) 799-6900